[Civ. No. 3801. Fourth Dist. Feb. 5, 1948.]

In re GILDA KIRKNER, an Abandoned Child. F. M. KIRKNER et al., Appellants, v. WINEA JUANITA SIMPSON, Respondent.

[Civ. No. 3802. Fourth Dist. Feb. 5, 1948.]

Adoption of MARGUERITE LAVONNE KIRKNER, a Minor. F. M. KIRKNER et al., Appellants, v. WINEA JUANITA SIMPSON, Respondent.

[Civ. No. 3803. Fourth Dist. Feb. 5, 1948.]

Guardianship of GILDA KIRKNER, a Minor. F. M. KIRKNER et al., Appellants, v. WINEA JUANITA SIMPSON, Respondent.

Duckworth, King & Knauf for Appellants.

Litta Bell Campbell and Wilson & Wilson for Respondent.

BARNARD, P. J.—These are appeals from orders granting the petitions, respectively, in an abandonment, an adoption, and a guardianship proceeding, involving a girl baby born on April 28, 1944, at the Loma Linda Hospital. The attending physician was Dr. Loleta Simpson, a member of the staff of this hospital, and she was assisted by her sister Dr. Winea Simpson, who is the petitioner here. We will refer to them as Dr. Loleta and Dr. Winea.

The parents of the child are F. M. Kirkner, who has never been divorced from his wife, and Mrs. Bitzner, a widow. These parties have lived together as man and wife since 1942, and Mrs. Bitzner's son Billy, who was 11 years old at the time of the trial, has lived with them. Mrs. Bitzner took the name of Kirkner and, for convenience, will be referred to as Mrs. Kirkner.

Mr. and Mrs. Kirkner operated a summer resort at Warren, New York. In October, 1943, they came to Palm Springs for the winter. In November, Mrs. Kirkner was examined at Loma Linda by Dr. Loleta, who ascertained she was pregnant. Dr. Loleta then had some six consultations with Mrs. Kirkner before labor began and several with Mr. Kirkner. Mrs. Kirkner entered the hospital on April 26, 1944, informing Dr. Loleta that they were anxious to return to New York and at her request measures were taken to hasten the birth of the baby, which was born on April 28, 1944. Mrs. Kirkner left the hospital on May 7, and they left by automobile for New York on May 13, 1944. The baby was given by Dr. Loleta to the petitioner, Dr. Winea, about June 1, 1944. She named it Marguerite but later changed the name to Gilda, to comply with a request made by Mrs. Kirkner.

Mr. and Mrs. Kirkner spent the next winter in Florida and returned to California in November, 1945. They remained near Palm Springs until the middle of February, 1946, when they returned to New York. They again returned to California on November 7, 1946. In the meantime, neither Mr. nor Mrs. Kirkner had paid anything toward the support of

the child, had made any effort to see it, or had made any serious attempt to find out where it was or who had it.

On February 2, 1946, Dr. Winea filed her petition for adoption. After their return to California in November, 1946, Mrs. Kirkner filed a petition for a writ of habeas corpus for the purpose of obtaining custody of the child. Shortly thereafter, Dr. Winea filed a petition for the appointment of herself as guardian of the person of the child and a petition for an order declaring the child free from the custody and control of its parents, pursuant to the provisions of chapter 2, part 1, division 2 of the Welfare and Institutions Code. Mrs. Kirkner filed an answer to each of the other petitions. By stipulation, the four matters were heard together and Mr. Kirkner was joined as an objector. Apparently the petition for writ of habeas corpus was denied. In any event, the court found in all respects in favor of Dr. Winea and all three of her petitions were granted. Both Mr. and Mrs. Kirkner have appealed from each of these orders.

The controlling question here is that raised by the appellants' contention that the evidence is not sufficient to support the finding that Mrs. Kirkner abandoned this child. It is first argued that while there is ample evidence of abandonment on the part of Mr. Kirkner this is not binding on Mrs. Kirkner since the child was illegitimate, and that the court has attempted to give effect to this evidence by erroneously finding that Mr. and Mrs. Kirkner were husband and wife. This finding inadvertently resulted from a general finding that all of the allegations of the various petitions were true, it being therein alleged that these parties were husband and wife. While erroneous, this finding is neither material nor prejudicial here. In an effort to minimize the evidence of abandonment by Mrs. Kirkner it is further argued that she did not speak English well, that she was in poor health at the time, and that she was induced to give up the baby by the fraud of Mr. Kirkner who she says made all of the arrangements, did all of her writing, and deceived her as to the actual situation. However, the record discloses that she had been in this country 15 years and talked English fluently; that she was not in poor health; that she was informed of practically everything which occurred; that she took an active part in the arrangements; that she has been at all times and still is acting in complete accord with Mr.

Kirkner; and that she expects to marry him when he secures a divorce.

While a close question would have been presented had the finding been the other way, there is ample evidence to sustain the finding of abandonment as made.

Dr. Loleta testified that at their first interview on November 17, 1943, Mrs. Kirkner told her that she did not wish a baby and asked her to find a home for it, saying "that the conditions were such it would be best for her not to keep the baby"; that her husband had left his former wife because of his four or five children; that she had a boy by a former marriage and felt it was a question of choosing between this baby and her husband; that she was anxious to stay with her husband; and that it would be better for the doctor to find a home for the baby when it was born. That on December 15, 1943, she had a talk with Mr. Kirkner in the presence of Mrs. Kirkner; that Mr. Kirkner concurred in the suggestion that Mrs. Kirkner had previously made and in reply to her question as to whether he wanted to keep the baby he said that he thought it was best not to do so, that he would feel silly to have a baby following him around at his age, that they traveled around a great deal and the baby would interfere with this, and that he thought it would be best that the baby had another home; and that he asked her to find a home for the baby. That the matter was talked over on several occasions thereafter but no change was suggested and "they always left it the same way." That in a conversation on February 9, 1944, Mr. Kirkner said: "Well, I think it is best for us not to keep the baby. If she really wants to she can." That when Mrs. Kirkner was admitted to the hospital on April 26, 1944, she expressed the hope that the doctor would find a good home for the baby; that Mrs. Kirkner saw the baby only once while she was in the hospital and then said that she was going through with the arrangement; that Mrs. Kirkner left the hospital on May 7, 1944, and she did not see her until a year and a half later, in the fall of 1945; that neither Mr. nor Mrs. Kirkner then mentioned the baby; that they had not mentioned it in several communications she had had from them in the meantime; that shortly before Mrs. Kirkner left the hospital she asked that "the people" be told of her request that the child be named "Gilda"; that in talking to Mrs. Kirkner she asked her why they did not board the child out while they were taking trips

so they would have the child when they returned, and that Mrs. Kirkner replied that she didn't think this would work; that Mr. and Mrs. Kirkner brought Billy to the hospital several times in December, 1945, but did not mention this baby; that they did not again mention the baby to her until after this proceeding was brought; and that shortly after the baby was born Mrs. Kirkner told her that she was not going to take the baby and under the circumstances did not want to nurse it.

Mr. Kirkner testified that before the baby was born he had a talk with Dr. Loleta with reference to the disposition of the child, that he told the doctor that he was a pretty old "duck" to have a young child, and that he agreed that the child should be cared for at the hospital "or be given to a young couple or a young person." That he told Mrs. Kirkner of this discussion about leaving the baby and Mrs. Kirkner replied that "she thought it was best to do so"; that he read to Mrs. Kirkner a letter addressed to Mr. and Mrs. Kirkner written on March 25, 1946, by Dr. Winea in which she told them she had applied for adoption papers on "little Gilda"; that in reply to this letter he wrote a letter dated April 18, 1946, the original of which is in evidence, in which he said, among other things, "We felt and still feel that it would be a much greater injustice to the child than to ourselves not to have done what we have" and "we are not the kind of people to go back on our word, so you need not fear that there will ever be any interference from us," and "we are going to be content and happy to know that she will be in good hands." In this letter Mr. Kirkner also said that they were sending a small gold locket for the child's second birthday, which was more than 100 years old and had been given to Mrs. Kirkner by her grandmother. This locket was received and is in evidence. Mr. Kirkner also testified that when he received Dr. Winea's letter dated March 25, 1946, about two years after the child was born, was the first time he had known what had become of the child; that he wrote his letter of April 18, 1946, as a "stall" for the purpose of throwing Dr. Winea off her guard and that he did not mean a word of what he had written; that they received the adoption papers on August 1, 1946, but that he had no time to do anything about them until after they closed for the winter; and that in the nearly three years which had elapsed neither he nor Mrs. Kirkner had contributed anything toward the support of the child.

Mrs. Kirkner testified that before the child was born Mr. Kirkner suggested that she get rid of it and let somebody else raise it; that she told Dr. Loleta Mr. Kirkner was her husband and that she would be very happy to find a young couple to take care of it since Mr. Kirkner thought he was too old; that it was agreeable to her that somebody else have the baby and she decided this was the best thing to do; that Mr. Kirkner also thought this was the best thing to do; that the day before she left the hospital she asked Dr. Loleta "if I may see the baby before she gavé it away"; that shortly after she left the hospital Mr. Kirkner told her he was telling his friends that the baby was dead; that during the six days they remained in California she did not go back to the hospital to see how the baby was getting along; that they came back to California in November, 1945, and remained about three months; that during this time they took Billy to this hospital six times for treatment; that she saw Dr. Loleta only once, usually remaining in the car; that she left all arrangements to Mr. Kirkner and made no effort to find the baby; that they then went back to New York; that Mr. Kirkner read all letters to her except that he kept one letter back; that Mr. Kirkner did all her writing for her; that when they sent the locket in April, 1946, she intended that whoever had the baby should keep the locket for the baby and that she never expected to get the locket back; that she had never sent any money for the baby and supposed that Dr. Loleta was caring for it; and that when she returned to California in November, 1946, she went right to Dr. Winea's home and had no trouble in finding it. Although Mrs. Kirkner claimed that she thought Dr. Loleta was to take care of the baby only temporarily her testimony and Mr. Kirkner's testimony, as a whole, strongly confirm the other view as testified to by Dr. Loleta and as accepted by the court.

There is other correspondence between the parties which strongly tends to support the finding; there is ample evidence of the good financial condition of the Kirkners; and it was stipulated that the child had a good home with Dr. Winea. In spite of any conflicts, the evidence is sufficient to support the finding of abandonment made by the trial court and the orders depending upon it. (Welf. and Inst. Code, § 701; *In re Peterson,* 56 Cal.App.2d 791 [133 P.2d 831]; *In re Creely,* 70 Cal. App.2d 186 [160 P.2d 870].)

The evidence is sufficient to support the findings and

order in the adoption proceeding and no abuse of discretion there appears. (*Adoption of Kelly,* 47 Cal.App.2d 577 [118 P.2d 479] ; *Guardianship of Peterson,* 64 Cal.App.2d 473 [149 P.2d 65] ; *Adoption of Martin,* 76 Cal.App.2d 133 [172 P.2d 552].)

While an order appointing a guardian of the person of this child may not have been necessary in view of the action taken in the other proceedings, no prejudice or reversible error appears.

For the reasons given, each of the three orders appealed from is affirmed.

Griffin, J., concurred.